This case arose out of an interpleader action filed in the Autauga Circuit Court by the Bank of Prattville n/k/a Whitney National Bank ("the Bank") for the disbursement of what the Bank determined to be excess sales proceeds the Bank received when it foreclosed on a mortgage lien against real property owned by Gurney Industries, Inc. ("Gurney"), and sold the real property (located in Autauga County) that had secured the mortgage.
The record reveals the following facts. It is undisputed that the Bank held the first mortgage on the property and that Southern Industries of Clover, Ltd. ("Southern Industries"), held a mortgage on the property subordinate to the Bank's mortgage. There were a number of judgment lienholders, including Austin Apparel, Inc. ("Austin Apparel").
On June 17, 1999, the Bank conducted a foreclosure sale on the steps of the Autuaga County courthouse; the property was sold at the sale for $190,000. On July 12, 1999, the Bank filed a "complaint for interpleader" and deposited with the court *Page 160 
$120,211.70[1] of the proceeds from the foreclosure sale. The Bank retained the remaining sales proceeds after having determined that, pursuant to the terms of the loan documents (i.e., the mortgage, the loan agreement, and the promissory note), the Bank was owed principal in the amount of $56,939 (which included a payment of $16,939 to Goodwyn, Mills Cawood Environmental Consultants, Inc. ("GMC Environmental Consultants"), for an environmental study); interest; attorney fees; and publication expenses.
On August 2, 1999, Southern Industries filed a "motion for a judgment on the pleadings," claiming that it was owed $119,214. Southern Industries arrived at $119,214 as follows: principal in the amount of $115,629; attorney fees in the amount of $3,500; and an abstract cost in the amount of $85. On November 9, 1999, the trial court entered a judgment in favor of Southern Industries in the amount of $115,629, and ordered the court clerk to pay Southern Industries $116,629.[2] In its judgment, the trial court reserved the issue of attorney fees and costs.
On June 12, 2000, the trial court held a hearing on the issue of whether Southern Industries should be paid attorney fees out of the sales proceeds. At the hearing, the parties stipulated to the admission of the loan documents and submitted the following written stipulation to the court:
 "(1) . . . [The] Bank . . . foreclosed a mortgage on June 17, 1999, which had been given from Gurney . . . to the Bank . . . .
 "(2) . . . Southern Industries . . ., which holds a second mortgage subordinate to the Bank['s] . . . mortgage, claims that it is owed certain attorney fees and an abstract cost out of the excess funds now being held by the Bank . . . from said foreclosure sale, and that said attorney fees and abstract costs are secured by the second mortgage from Gurney . . . in favor or Southern Industries. . . .
 "(3) The mortgage from Gurney . . . in favor of Southern Industries . . . has never been foreclosed."
The record does not include a transcript of the hearing. The court entered a judgment in favor of Southern Industries on June 12, 2000, and awarded it $3,585 as attorney fees.[3] The judgment entered on the case action summary sheet stated:
 "Case called on issue of attorney fee issue for 2nd [mortgage] holder who did not foreclose, parties stipulated as to documents, identified by party and their date. Stipulation entered in writing. Issue submitted. Upon hearing the stipulation and review of the exhibits, Court determines the attorney fee awarded to Southern Industries . . . to be $3585 and same to be appropriate under the mortgage and note."
Austin Apparel filed a counterclaim to determine whether the Bank was entitled *Page 161 
to charge against the sales proceeds the full amounts the Bank claimed it was owed pursuant to the loan documents. On November 19, 2001, the trial court held a hearing on, among other things, the appropriateness of the Bank's charging against the sales proceeds the sum of $16,939 for an environmental study. At the hearing, the parties stipulated to, among other things, the admission of the loan documents. Two witnesses testified regarding the environmental study: (1) Myron Smith, the attorney who had represented the Bank regarding this matter until just before the hearing when he withdrew as counsel after it was determined that he would be a witness at the hearing; and (2) Galen Thackston of GMC Environmental Consultants.
The testimony and other evidence presented at the hearing established the following facts regarding the environmental study. After Gurney had defaulted on the note, the Bank retained Smith to collect the indebtedness and to foreclose on the mortgage lien, if necessary. The Bank gave Smith what the parties referred to as a "phase-one" environmental study, which Smith testified "was basically a walk-through examination of the collateral which indicated the probability of hazardous material contaminants throughout the collateral." Smith testified that the Bank requested his advice "as to whether [the] Bank . . . could call on . . . [Gurney] to move forward with a phase two environmental impact study for the purpose of determining . . . the extent of contamination and the probable cost of correcting or repairing the collateral, eliminating the hazardous materials from the collateral."
After reviewing the loan documents, Smith advised the Bank that the loan documents authorized the Bank to call upon Gurney to pay for a phase-two environmental-impact study. Smith testified:
 "I read all of those paragraphs [referring to certain paragraphs in the loan documents]. The paragraph to me indicated that, number one, the borrower promised that there would be no toxic waste to begin with and there wouldn't be any in the future, and to correct any defects in the collateral which were referred to under the concepts of repairs, in my estimation. It appeared to me that the [B]ank upon notice that there is toxic — apparent toxic waste on the property was within its rights to demand of the debtor the phase two environmental impact study to help everyone who was interested in this property figure out to what extent it has been contaminated and what's going to be the expected dollar cost of cleaning it up."
The pertinent sections of the loan documents discussed by Smith at the hearing and/or the parties in their briefs on appeal are:
"MORTGAGE
 "1. OBLIGATIONS. This Mortgage shall secure the payment and performance of all present and future indebtedness, liabilities, obligations and covenants of Borrower or Mortgagor (cumulatively `Obligations') to Lender pursuant to:
 "(a) this Mortgage and the following promissory notes and other agreements: . . .
 "(b) all other present or future, written agreements with Lender which refer specifically to this Mortgage (whether executed for the same or different purpose than the foregoing);
". . . .
 "(e) all amendments, extensions, renewals, modifications, replacements or substitutions to any of the foregoing. *Page 162 
"2. REPRESENTATIONS, WARRANTIES AND COVENANTS.
". . . .
 "(b) Mortgagor is in compliance in all respects and with all applicable federal, state and local laws and regulations, including, without limitation, those relating to `Hazardous Materials,' as defined herein and other environmental matters. . . . Neither Mortgagor nor, to the best of Mortgagor's knowledge, has any other party used, generated, released, discharged, stored, or disposed of any Hazardous Materials, in connection with the Property or transported any Hazardous materials to or from the Property. Mortgagor shall not commit or permit such actions to be taken in the future. . . .
". . . .
 "(f) Mortgagor has not violated and shall not violate any statute, regulation, ordinance, rule, or law, contract, or other agreement (including, but not limited to, those governing Hazardous Materials) which might materially affect the Property or Lender's rights or interests in the Property pursuant to this Mortgage.
". . . .
 "9. USE AND MAINTENANCE OF PROPERTY. Mortgagor shall take all actions and make any repairs needed to maintain the Property in good condition. Mortgagor shall not commit or permit any waste to be committed with respect to the Property. . . .
 "10. LOSS OR DAMAGE. Mortgagor shall bear the entire risk of any loss . . . or damage (cumulatively `Loss or Damage') to the property from any cause whatsoever. In the event of any Loss or Damage, Mortgagor shall, at the option of Lender, repair the affected Property to its previous condition or pay or cause to be paid to Lender the decrease in the fair market value of the affected Property.
". . . .
 "15. INDEMNIFICATION. Lender shall not assume or be responsible for the performance of any of Mortgagor's obligations with respect to the Property under any circumstances. Mortgagor shall immediately provide Lender with written notice of and indemnify and hold Lender . . . harmless from all claims . . . pertaining to the Property (including, but not limited to, those involving Hazardous Materials). . . . In the alternative, Lender shall be entitled to employ its own legal counsel to defend the Claims at Mortgagor's cost. Mortgagor's obligation to indemnify Lender under this paragraph shall survive the termination, release or foreclosure of this Mortgage.
". . . .
 "20. RIGHTS OF LENDER ON DEFAULT. If there is a default under this Mortgage, Lender shall be entitled to exercise one or more of the following remedies without notice or demand (except provided by law):
". . . .
 "(f) to pay any sums in any form or manner deemed expedient by Lender to protect the security of this Mortgage or to cure any default other than payment of interest or principal on the Obligations.
". . . .
 "The proceeds from the sale of the Property shall be applied as follows: first, to the expense of advertising, preparing, selling, and conveying the Property for sale, including reasonable attorney fees incurred by Lender in the foreclosure action or any . . . appeal . . . challenging the right of Lender to foreclose this mortgage or sell any of the property; *Page 163 
second, to the payment of any amounts expended or that may be necessary to expend to pay taxes, insurance, . . . and other liens and mortgages; third, in full or partial payment of the Obligations in such order as Lender may elect; and fourth, the balance, if any, to be paid in accordance with the requirements of law.
". . . .
 "22. REIMBURSEMENT OF AMOUNTS EXPENDED BY LENDER. Lender, at Lender's option, may expend funds (including attorneys' fees and legal expenses) to perform any act required to be taken by Mortgagor or to exercise any right or remedy of Lender under this Mortgage. . . . These sums shall be included in the definition of Obligations herein and shall be secured by the beneficial interest granted herein. . . .
 "23. APPLICATION OF PAYMENTS. All payments made by or on behalf of Mortgagor may be applied against the amounts paid by Lender (including attorneys' fees and legal expenses) in connection with the exercise of its rights and remedies described in this Mortgage and then to the payment of the remaining Obligations in whatever order lender chooses.
 "26. COLLECTION COSTS. If the original amount of the Obligations exceed $300, and if Lender hires an attorney who is not a salaried employee to collect any amount due under the Obligations or enforce any right or remedy of Lender under this Mortgage, Mortgagor agrees to pay Lender's reasonable expenses and collection costs, including reasonable attorneys' fees not exceeding 15% of the unpaid debt after default."
(Emphasis added.)
"LOAN AGREEMENT
"6. REPRESENTATIONS AND WARRANTIES.
". . . .
 "j. Obligations. This agreement and each Loan Document constitutes Borrower's legal and binding obligations to Lender and are fully enforceable in accordance with their respective terms and conditions;
". . . .
 "t. Compliance with Applicable Environmental Law. Borrower. . . and [its] . . . properties are and shall be in compliance with all environmental . . . laws, rules and regulations, and neither Borrower . . . is or shall be subject to any liability or obligation for remedial action thereunder. . . . No Hazardous Materials are or shall be located on or under . . . Borrower's . . . properties. Neither Borrower nor . . . has caused or permitted or shall cause or permit any toxic or hazardous waste or substance to be stored, transported, or disposed of on or under or released from any of its properties.
 "7. COVENANTS OF BORROWER. Borrower covenants and agrees with Lender as follows:
". . . .
 "c. Use of Collateral. Borrower shall use . . . the Collateral . . . in compliance with the laws, . . . regulations, . . . of all federal, state, county . . . authorities. . . . Borrower shall take . . . all actions and make any repairs or replacements needed to maintain the property in good condition and working order.
". . . .
 "m. Borrower's Agreement to Take Action. Borrower shall . . . take any actions as may be requested by Lender to carry out the intent and purposes of this Agreement and Loan Documents and the transactions contemplated *Page 164 
thereby and to preserve and perfect Lender's liens, security interests and other encumbrances in the Collateral;
". . . .
 "15. REIMBURSEMENT OF EXPENSES. Upon demand, Borrower shall immediately reimburse . . . Lender for all amounts (including all out-of-pocket expenses of Lender . . . for environmental consultants . . . retained by Lender in connection with any . . . collection or enforcement proceedings) expended by Lender . . . to (iv) enforcement or defense of any obligation or the exercise of any right or remedy described in this Agreement or the Loan Documents."
(Emphasis added.)
A letter Smith wrote to Gurney (dated October 28, 1998) was also introduced into evidence; that letter provided:
 "[The] Bank . . . has referred your delinquent loan . . . to my office for possible foreclosure. Before a foreclosure sale is scheduled, [the] Bank . . . deems it necessary to clear up certain environmental concerns. The attached Phase One Inspection Report sets out several matters which require specific testing to further assess adverse environmental impact.
 "The issues raised by the Phase One Report suggest there has been a violation of the Representations, Warranties, and Covenants of paragraph (2) of the mortgage. [The] Bank . . . now needs to cure or remedy this matter by proceeding to secure a Phase Two [A]ssessment of the environmental concerns.
 "The purpose of this letter is to notify Gurney . . . that [the] Bank . . . is aware of environmental issues concerning its collateral, and that the Bank now requests that Gurney . . . furnish a Phase Two Assessment which will address all concerns outlined in the Phase One Report. If you do not give assurances that you will proceed to retain qualified persons to furnish the required Phase Two Assessment and claim the costs against Gurney . . . . Should there be a subsequent foreclosure, all costs of securing these environmental assessments, and any repair or cleanup expense will be claimed out of the sales proceeds."
Galen Thackston of GMC Environmental Consultants testified that the phase-two assessment was done after a quick walk-through and that some areas of concern were identified. Thackston and Smith both testified that the phase-two study confirmed that there were environmental infractions on the property. Referring to the phase-two report, Smith testified:
 "The phase-two report indicated a cleanup cost of . . . like between fifteen and twenty thousand dollars. . . . There was keen interest in the extent of that environmental hazard there and the results of that phase-two report. . . . I made the environmental impact study available to everybody who was interested in the property. . . . I even had the phase-two report at the foreclosure sale for anybody that showed up unexpectedly to consider bidding on the property.
". . . .
 "There was . . . some detailed information in there about the type of contaminants that were found and the depth that they had soaked into the soil . . . ."[4] *Page 165 
The trial court entered a judgment in favor of the Bank, finding that the payment for the environmental study was proper under the Bank's mortgage. The judgment, entered on the case action summary sheet, stated:
 "Case called, argument heard concerning the appropriateness of charging borrower with the environmental study. Testimony taken on issue of charges made against foreclosure proceeds. Upon hearing the testimony, Court finds . . . the amount of $16,939 as paid for the environmental study as paid by the Bank from sale proceeds to be proper under the mortgage."
On appeal, Austin Apparel contends that the Bank did not have authority to charge against the sale proceeds the cost of the environmental study because, it says, none of the loan documents gave the Bank authority to incur such costs on behalf of Gurney. We disagree.
It is well settled that the words of a contract are to be given their ordinary meaning and that the intention of the parties is to be derived, if possible, from the provisions of the contract itself. Food Serv.Distribs., Inc. v. Barber, 429 So.2d 1025, 1028 (Ala. 1983) (citing Siscov. Empiregas, Inc., 286 Ala. 72, 237 So.2d 463 (1970)). Where a contract, by its terms, is plain and free from ambiguity, there is no room for construction and the contract must be enforced as written. Exparte Conference America, Inc., 713 So.2d 953, 956 (Ala. 1998); Ex parteSouth Carolina Ins. Co., 683 So.2d 987, 989 (Ala. 1996). "[A] document is unambiguous if only one reasonable meaning emerges." Wayne J. GriffinElec., Inc. v. Dunn Constr. Co., 622 So.2d 314, 317 (Ala. 1993). In other words, "[w]hen any aspect of a contract is capable of more than one meaning, it is ambiguous." Voyager Life Ins. Co. v. Whitson, 703 So.2d 944,948 (Ala. 1997). When the terms of a contract are ambiguous, the true meaning of the contract becomes a question for the fact-finder. Mooneyv. Henderson Walton Women's Center-East, Inc., 684 So.2d 1340
(Ala.Civ.App. 1996). "If one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity." Voyager Life Ins. Co., 703 So.2d at 949.
After a careful review of the mortgage and the loan agreement, we conclude that, even if those documents are deemed ambiguous as to the issue before us, based on the record presented there was no reversible error in the trial court's interpretation and application of the same. We therefore affirm that portion of the trial court's judgment in which it concludes that the Bank properly paid for and was properly reimbursed for the environmental study in question. Austin Apparel also contends that the trial court erred in awarding attorney fees to Southern Industries because, it says, pursuant to the terms of the second mortgage, Southern Industries is entitled to be paid attorney fees only if there is a foreclosure of Southern Industries' second mortgage lien. It is undisputed that Southern Industries did not foreclose on the second mortgage.
"`In Alabama and most other jurisdictions, the general rule is that *Page 166 
attorney's fees and expenses of litigation are not recoverable as damages, in [the] absence of a contractual or statutory duty, other than [by] a few recognized . . . equity principles.'" Ex parte Burnham,Klinefelter, Halsey, Jones Cater, P.C., 674 So.2d 1287, 1290 (Ala. 1995) (quoting Highlands Underwriters Ins. Co. v. Elegante_ Inns, Inc.,361 So.2d 1060, 1065-66 (Ala. 1978)).[5] A mortgagee therefore may recover the attorney fees incurred in the enforcement of the mortgage where the mortgage contractually imposes a duty on the mortgagor to pay those fees. See Lunceford v. Monumental Life Ins. Co., 641 So.2d 244
(Ala. 1994) (holding that the mortgagees were entitled to reasonable attorney fees where the mortgage contract stated that the mortgagees could recover attorney fees in their efforts to enforce any obligation pertaining to the mortgage). In Taylor v. Jones, 290 Ala. 268, 276 So.2d 130
(1973), the Supreme Court held that where a note contained a provision requiring the mortgagor to pay all costs of collecting or securing or attempting to collect or secure the note, including a reasonable attorney fee, whether the same be collected or secured by suit or otherwise, "[t]he claim for an attorney's fee is as much a part of the contract as any other feature of it. Such fees, under the contract, become an effective part of the main debt." 290 Ala. at 271, 276 So.2d at 133
(citation omitted).
In the present case, however, Southern Industries' mortgage authorizes payment of attorney fees only in the event of, and from the proceeds derived from, a foreclosure of that mortgage. Southern Industries' mortgage provides, in pertinent part:
 "[S]hould the interest of said Mortgagee . . . in said property become endangered by reason of the enforcement of any prior lien or incumbrance thereon, so as to endanger the debt hereby secured, then in any one of those events, the whole of the said indebtedness hereby secured shall at once become due and payable, and this mortgage be subject to foreclosure as now provided by law in case of past due mortgages, and the said Mortgagee . . . shall be authorized . . . to sell the [property] . . . and apply the proceeds of the sale: First, to the expense of advertising, selling and conveying, including a reasonable attorney's fee . . . and the undersigned further agree to pay a reasonable attorney's fees to said Mortgagee . . . for the foreclosure of this mortgage in Chancery, should the same be so foreclosed, said fee to be a part of the debt hereby secured."
There is no other provision in Southern Industries' mortgage that authorizes the payment of attorney fees in connection with the collection of the indebtedness secured thereby.
We conclude, based on the plain language of Southern Industries' mortgage, that that mortgage did not entitle Southern Industries to recover the attorney fees awarded to it by the trial court in this case.[6]
Based on the foregoing analysis and authorities, the judgment of the trial court is *Page 167 
affirmed in part and reversed in part, and the cause is remanded for the trial court to enter a judgment consistent with this opinion.
The Bank and Southern Industries' requests for attorney fees on appeal are denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
[1] We note that on November 1, 1999, the Bank filed an amended complaint and deposited with the court an additional $142.23 of the proceeds from the foreclosure sale.
[2] Austin Apparel filed a motion to amend the judgment, seeking to correct the $1,000 clerical error. The trial court amended the judgment accordingly. However, the clerk inadvertently paid $116,629 to Southern Industries. Although Southern Industries did not repay the $1,000 overpayment to the court, the clerk offset that overpayment when a subsequent judgment in this case was entered in favor of Southern Industries awarding it attorney fees in the amount of $3,585 (discussedinfra).
[3] The trial court apparently included the $85 cost of the abstract of title as part of the attorney fees; whether the $85 should be included as part of the attorney fees is not an issue on appeal.
[4] We also note that the foreclosure deed referred to the environmental issues. The foreclosure deed was attached as Exhibit G to the complaint for interpleader filed by the Bank. Regarding the environmental issues, the deed provided:
 ". . . [T]he auctioneer announce[d] the terms of the foreclosure sale including a specific disclosure to all present that both a Phase I and Phase II Environmental Site Evaluation had been performed, disclosing multiple site contaminations; and,
 "WHEREAS, . . . auctioneer . . . offered for inspection written reports disclosing environmental site contaminations for review by prospective purchasers. . . ."
[5] In addition, the Alabama Supreme Court went on to hold in HighlandsUnderwriters that "it is generally recognized that where the natural and proximate consequences of the defendant's wrongful act [cause] the plaintiff to become involved in litigation with a third person, attorneys' fees and other expenses incurred in such litigation may be recovered as damages." 361 So.2d at 1066. This additional holding in HighlandsUnderwriters is inapposite to the case before us.
[6] We note that the record is somewhat confusing regarding what documents the trial court considered in finding that the attorney fees were "appropriate under the mortgage and note." There does not appear to have been a promissory note pertaining to the second mortgage; there is no such promissory note in the record. The second mortgage states that it secured two open accounts "without any due dates or specific payment terms." If the record had contained a promissory note providing for the payment of attorney fees incurred for the collection of the indebtedness, our decision as to this issue might have been different.